No. 23-15911

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HEY, INC.,

*Plaintiff-Appellee*,

*v.*

TWITTER, INC.,

*Defendant-Appellee*,

*v.*

JOHN DOE 1 AND JOHN DOE 2,

*Movants-Appellants*.

On Appeal from the United States District Court
for the Northern District of California, No. 4:22-MC-80034-DMR (Ryu, J.)

## BRIEF FOR DEFENDANT-APPELLEE
## TWITTER, INC. IN SUPPORT OF MOVANTS-APPELLANTS

JONATHAN HAWK
MCDERMOTT WILL & EMERY
2049 Century Park East
Suite 3200
Los Angeles, CA 90067
(310) 788-4181

ARI HOLTZBLATT
JEREMY W. BRINSTER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
ari.holtzblatt@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

November 20, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for X Corp., successor in interest to named Defendant-Appellee Twitter, Inc., states that Twitter, Inc. has been merged into X Corp. and no longer exists. X Corp. is a privately held corporation. Its parent corporation is X Holdings Corp. No publicly traded corporation owns 10% or more of the stock of X Corp. or X Holdings Corp.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES .......................................................................... iii

INTRODUCTION ........................................................................................1

STATEMENT OF ISSUES .............................................................................4

STATEMENT OF THE CASE .........................................................................4

    A.    The X Platform ...........................................................................4

    B.    John Doe 1, John Doe 2, And @DJ_AsadaAkira's X Accounts ..........5

    C.    Proceedings Below ......................................................................7

STANDARD OF REVIEW .......................................................................... 12

SUMMARY OF THE ARGUMENT .............................................................. 13

ARGUMENT ........................................................................................... 14

I.    THE DISTRICT COURT ABUSED ITS DISCRETION BY NOT APPLYING *HIGHFIELDS* ............................................................................... 14

    A.    The *Highfields* Test Must Be Applied Under *Intel* Because A Section 1782 Discovery Order Is Not "Appropriate" If It Would Burden First Amendment Rights Without Adequate Justification ............................................................................... 17

    B.    The *Highfields* Test Must Be Applied Even If The Anonymous Speakers To Be Unmasked May Be Noncitizens Outside The United States ........................................................................... 20

            1.    Unmasking Anonymous Speech By Noncitizens Abroad Burdens The Right Of American Citizens To Hear That Speech ........................................................................... 22

            2.    Unmasking Anonymous Users Who Are Noncitizens Living Abroad Burdens The Right Of Platforms To Make First Amendment-Protected Editorial Decisions ...................... 27

            3.    Unmasking Anonymous Speech Hosted By U.S.-Based Platforms May Burden The First Amendment Rights Of The Speakers, Even If They Are Noncitizens Abroad ............. 31

    C.    The Near-Uniform Practice Of Jurisdictions Across The Country Supports Application Of The *Highfields* Test ...................... 33

D.     Supreme Court Jurisprudence Applying "Exacting Scrutiny" To Burdens On Anonymous Speech Likewise Supports Application Of The *Highfields* Test ....................................................37

E.     Vital Public Interests Served By Anonymous Speech Support Application Of The *Highfields* Test ....................................................40

II.    THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING THE MOTION TO QUASH THE SUBPOENA BECAUSE HEY DID NOT SATISFY *HIGHFIELDS* ....................................................................43

CONCLUSION ....................................................................................50

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Agency for International Development v. Alliance of Open Society International, Inc.*, 140 S. Ct. 2082 (2020) ...................................................32

*Americans for Prosperity Foundation v. Bonta*,
141 S. Ct. 2373 (2021)...............................................................38, 39

*Bigelow v. Virginia*,
421 U.S. 809 (1975).........................................................................18

*Citizens United v. FEC*,
558 U.S. 310 (2010).........................................................................27

*Columbia Insurance Co. v. seescandy.com*,
185 F.R.D. 573 (N.D. Cal. 1999) ...................................................35

*Dendrite International, Inc. v. Doe No. 3*,
775 A.2d 756 (N.J. App. Div. 2001) ...........................34, 36, 40, 49

*Doe v. Cahill*,
884 A.2d 451 (Del. 2005)...........................................................35, 37

*Doe v. Coleman*,
497 S.W.3d 740 (Ky. 2016)..............................................................34

*Fodor v. Doe*,
2011 WL 1629572 (D. Nev. Apr. 27, 2011) ...................................16

*Four Pillars Enterprises v. Avery Dennison Corp.*,
308 F.3d 1075 (9th Cir. 2002) .........................................................12

*Highfields Capital Management, L.P. v. Doe*, 385 F. Supp. 2d 969
(N.D. Cal. 2005) ................ 2, 4, 10, 15, 16, 19, 20, 34, 35, 38, 40, 43, 48, 50

*Hunt v. City of Los Angeles*,
638 F.3d 703 (9th Cir. 2011) ...........................................................40

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,
Inc.*, 515 U.S. 557 (1995) ...................................................27, 28, 31

*Ibrahim v. Department of Homeland Security*,
    669 F.3d 983 (9th Cir. 2012) ...................................................................31, 33

*In re Anonymous Online Speakers*,
    661 F.3d 1168 (9th Cir. 2011) .......................................................15, 26, 39, 40

*In re Cathode Ray Tube (CRT) Antitrust Litigation*,
    2013 WL 183944 (N.D. Cal. Jan. 17, 2013)....................................................19

*In re DMCA § 512(h) Subpoena to Twitter, Inc.*,
    608 F. Supp. 3d 868 (N.D. Cal. 2022)......................................................15, 50

*In re Indiana Newspapers Inc.*,
    963 N.E.2d 534 (Ind. App. 2012) ......................................................34, 36, 37

*In re PGS Home Co. Ltd.*,
    2019 WL 6311407 (N.D. Cal. Nov. 25, 2019) .........................................15, 18

*In re Planning & Development of Education, Inc.*,
    2022 WL 228307 (N.D. Cal. Jan. 26, 2022)....................................................18

*In re Subpoena Duces Tecum to America Online, Inc.*,
    52 Va. Cir. 26 (2000) .......................................................................................35

*In re Takada*,
    2023 WL 1442844 (N.D. Cal. Feb. 1, 2023)...................................................21

*In re Yasuda*,
    2020 WL 759404 (N.D. Cal. Feb. 14, 2020)............................................10, 20

*Independent Newspapers, Inc. v. Brodie*,
    966 A.2d 432 (Md. 2009) ...........................................................................35, 36

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004).........................................................................8, 9, 17, 18

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010).....................................................................................30, 38

*Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*,
    895 F.3d 238 (2d Cir. 2018) ...........................................................................19

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972)............................................................22, 23, 24

*Krinsky v. Doe 6*,
    159 Cal. App. 4th 1154 (2008) ..............................................35, 36

*Lamont v. Postmaster General of United States*,
    381 U.S. 301 (1965)........................................................23, 24, 26

*McIntyre v. Ohio Elections Commission*,
    514 U.S. 334 (1995)..........................................14, 15, 38, 40, 42

*Miami Herald Publishing Co. v. Tornillo*,
    418 U.S. 241 (1974)...............................................................27, 30

*Mobilisa, Inc. v. Doe*,
    170 P.3d 712 (Ariz. App. 2007) .......................................35, 36, 37

*Moody v. NetChoice, LLC*,
    2023 WL 6319654 (U.S. Sept. 29, 2023).................................28, 29

*Music Group Macao Commercial Offshore Ltd. v. Does*,
    82 F. Supp. 3d 979 (N.D. Cal. 2015)............................................15

*NetChoice, LLC v. Attorney General*,
    34 F.4th 1196 (11th Cir. 2022) ................................................28, 29

*O'Handley v. Padilla*,
    579 F. Supp. 3d 1163 (N.D. Cal. 2022).........................................28

*O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) .........................28, 29

*Pacific Gas & Electric Co. v. Public Utilities Commission of
    California*,
    475 U.S. 1 (1986).............................................................................28

*Packingham v. North Carolina*,
    582 U.S. 98 (2017).........................................................................42

*Pilchesky v. Gatelli*,
    12 A.3d 430 (Pa. Super. 2011) .............................................34, 36, 37

*Reno v. ACLU*,
    521 U.S. 844 (1997)......................................................................................15

*Solers, Inc. v. Doe*,
    977 A.2d 941 (D.C. 2009) .............................................................35, 37, 40

*Takagi v. Twitter*,
    2023 WL 1442893 (N.D. Cal. Feb. 1, 2023)..................................................21

*Thomson v. Doe*,
    356 P.3d 727 (Wash. App. 2015) ...................................................................34

*Thunder Studios, Inc. v. Kazal*,
    13 F.4th 736 (9th Cir. 2021)................................................23, 24, 26, 32, 33

*Tokyo University of Social Welfare v. Twitter*,
    2021 WL 4124216 (N.D. Cal. Sept. 9, 2021)..................................15, 40, 49

*Turner Broadcasting System, Inc. v. FCC*,
    512 U.S. 622 (1994)......................................................................................28

*Twitter, Inc. v. Garland*,
    61 F.4th 686 (9th Cir. 2023) .........................................................................27

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990)................................................................................31, 32

*United States v. Williams*,
    68 F.4th 564 (9th Cir. 2023) .........................................................................12

*Wang v. Reno*,
    81 F.3d 808 (9th Cir. 1996) ..........................................................................32

*Wirt v. Twitter, Inc.*,
    2021 WL 5919846 (N.D. Cal. Dec. 15, 2021) ..............................................15

*Zhang v. Baidu.com Inc.*,
    10 F. Supp. 3d 433 (S.D.N.Y. 2014) ............................................................28

*Zuru, Inc. v. Glassdoor, Inc.*,
    614 F. Supp. 3d 697 (N.D. Cal. 2022)...............................................19, 21, 22

# STATUTE

28 U.S.C. § 1782 ..................................................................................1, 7, 12, 17

# OTHER AUTHORITIES

15A Wright & Miller, Federal Practice & Procedure (3d ed. Apr. 2022
      update) ...................................................................................................12

Alcoholics Anonymous, Understanding Anonymity (June 2023),
      https://www.aa.org/sites/default/files/literature/p-
      47_understandinganonymity.pdf ..............................................................41

Araujo, Robert J., *International Tribunals and Rules of Evidence: The*
      *Case for Respecting and Preserving the "Priest-Penitent"*
      *Privilege under International Law*, 15 Am. U. Int'l L. Rev. 639
      (2000)........................................................................................................41

Libit, Bill, *Elements of an Effective Whistleblower Hotline*, Harvard
      Law School Forum on Corporate Governance (Oct. 25, 2014),
      https://corpgov.law. harvard.edu/2014/10/25/elements-of-an-
      effective-whistleblower-hotline .................................................................41

*Misleading And Deceptive Identities Policy*, X Help Center (Apr.
      2023), https://help.twitter.com/en/rules-and-policies/x-
      impersonation-and-deceptive-identities-policy .........................................5, 29

*Names Allowed On Profiles*, LinkedIn Help,
      https://www.linkedin.com/help/linkedin/answer/a1337288.........................29

Rainie, Lee, et al., *Anonymity, Privacy, and Security Online*, Pew
      Research Center (Sept. 5, 2013),
      https://www.pewresearch.org/internet/2013/09/05/anonymity-
      privacy-and-security-online.......................................................................42

Reporters' Committee for Freedom of Press, *Reporter's Privilege*
      *Compendium*, https://www.rcfp.org/reporters-privilege ..............................41

Substance Abuse and Mental Health Services Administration,
      *National Helpline: Frequently Asked Questions*,
      https://www.samhsa.gov/find-help/national-helpline ..................................41

U.S. Government Accountability Office, *Report and Prevent Fraud*,
https://www.gao.gov/about/what-gao-does/fraud ........................................41

*Why Do Some Writers Use Pseudonyms?*, The Economist (July 25,
2013) ...........................................................................................................42

# INTRODUCTION

The mission of X Corp.—the successor to named Defendant-Appellee Twitter, Inc.—is to promote and protect the public conversation. X Corp. is committed to free expression for all who gather on its platform, X (formerly Twitter), to speak and to listen, including the accountholders whose speech has been targeted in this case. An integral part of that commitment is giving people a choice about how to present themselves to the public. X Corp. therefore allows the use of pseudonymous accounts, meaning an account's profile is not required to use the real name or image of the accountholder. And when X Corp is served with legal process seeking to unmask the identities of accountholders who have chosen to speak anonymously on its platform, X Corp. regularly takes steps to protect those accountholders' anonymity, including by moving to quash.

That is what happened here: Plaintiff-Appellee hey, inc. ("Hey"), a Japanese company, applied under 28 U.S.C. § 1782 for permission to issue a subpoena demanding that X Corp. hand over documents providing information about the identities of three anonymous X accountholders because they used their accounts to publicly criticize Hey, its current CEO, and former CEO. Two of those three accountholders are Movant-Appellants John Doe 1 and John Doe 2 (the "Does"). According to Hey, it intended to use information about the accountholders' identities to sue them in Japan. X Corp. moved to quash, arguing

that the court could not enforce the subpoena because unmasking the accountholders would result in First Amendment harms and Hey had not established a real evidentiary basis for its contemplated suit or shown that its interest in discovery outweighed those harms. The Does joined the motion and continue to fight Hey's subpoena before this Court.

As the Does correctly argue in their opening brief, the district court erred when it enforced Hey's subpoena because it disregarded the First Amendment interests at stake and thus failed to apply the test set out in *Highfields Capital Management, L.P. v. Doe*, 385 F. Supp. 2d 969, 980 (N.D. Cal. 2005). Because the right to speak anonymously is an essential component of the right to free speech protected by the First Amendment, courts routinely hold plaintiffs to a high standard before enforcing subpoenas that would unmask anonymous speakers like the accountholders. Courts in this Circuit typically apply the test set forth in *Highfields*, which requires that a plaintiff present a "real evidentiary basis" for the claims it seeks to assert, and that the court determine that "enforcing the subpoena would cause relatively little harm to the defendant's First Amendment and privacy rights and that its issuance is necessary to enable plaintiff to protect against or remedy serious wrongs." *Id.* at 975-976. The *Highfields* test embodies the minimum constitutional safeguards that courts must apply when evaluating a

- 2 -

subpoena that would unmask anonymous speech, including in the form of a
discovery request under Section 1782.

The district court believed that it need not apply *Highfields* because there
was no evidence indicating that the accountholders in this case are U.S. citizens
and so, it believed, there were no First Amendment interests at stake. That was
error, as the Does have argued. Contrary to a recent—and misguided—trend of
district court decisions, *Highfields* applies even when plaintiffs seek to unmask
anonymous speakers who are noncitizens outside of the United States or whose
citizenship is not clear from the record. In such cases, the First Amendment
protects the rights of U.S. citizens to *hear* the anonymous speech at issue, the
rights of U.S.-based platforms such as X to *disseminate* the anonymous speech,
and the rights to *speak* anonymously of the speakers themselves, who may have
First Amendment protections by virtue of their substantial connections to the
United States, even if they are not U.S. citizens. Each of those interests is
implicated here. Unmasking the accountholders would burden the rights of
American citizens (including potential U.S.-based investors in Hey) to receive
anonymous speech ostensibly critical of Hey's high-level corporate executives;
would interfere with X Corp.'s right to curate a platform where anonymous
speakers can gather and converse; and would potentially infringe the rights of the

accountholders themselves, who at the very least have sought to further their connections with the United States by speaking on X, a U.S.-based platform.

The district court's refusal to apply *Highfields*—and its disregard for the First Amendment interests at stake—led it to misapply the law. As the Does argued, if the district court had held Hey to the *Highfields* standard, it would have found that Hey failed to make the required showing in support of its Japanese law claims. This Court should reverse.

## STATEMENT OF ISSUES

1.     Whether the district court abused its discretion by declining to apply the standard articulated in *Highfields Capital Management, L.P. v. Doe*, 385 F. Supp. 2d 969 (N.D. Cal. 2005), and consistently applied by courts across the country, before ordering X Corp. to produce documents providing information about the identity of users who have chosen to speak anonymously on its platform.

2.     Whether the district court abused its discretion by denying the motion to quash where the subpoena applicant made no showing that its claims against the anonymous speakers targeted by the subpoena would succeed.

## STATEMENT OF THE CASE

### A.     The X Platform

X Corp. operates X, a global communications platform through which over half a billion people share views and follow current events. X Corp. "believe[s]

- 4 -

giving people choice in terms of how they represent themselves online enables them to express themselves and control their privacy." *Misleading And Deceptive Identities Policy*, X Help Center (Apr. 2023), https://tinyurl.com/287ejm7f. It therefore "allows the use of pseudonymous accounts, meaning an account's profile is not required to use the name or image of the account owner." *Id.*

### B. John Doe 1, John Doe 2, And @DJ_AsadaAkira's X Accounts

Appellants John Doe 1 and John Doe 2 are X accountholders who engage in anonymous speech on X Corp.'s online platform. 1-ER-3-4; 3-ER-185-186. Their accounts are "@cogitopp" and "@mlnk901" respectively. Does Br. 4. Appellee Hey is a Japanese startup company that seeks to compel X Corp. to produce documents that would reveal information about the real identities of the Does and a third, non-party anonymous accountholder, who operates the handle @DJ_AsadaAkira. According to Hey, it plans to sue the operators of those anonymous accounts in Japan for defamation and unlawful business interference. 1-ER-3.

Hey asserts that its claims in Japan would be based on a series of Japanese-language posts made by the Does and @DJ_AsadaAkira (collectively the

"accountholders") on X.[1]  First, Appellants posted several remarks critical of an

unnamed company and its CEO.  3-ER-186-187:

- **Tweet 1A by @mlnk901 on September 10, 2021**:  "When a friend who works for a fund asked me about a certain company H, I told him there are some shady stuff lurking in multiple areas other than business potential and track record.  He seemed to have decided not to be involved with the company after also personally feeling it risky.  And the tequila incident happened sometime after that.  I guess his decision turned out to be a good one."  3-ER-186; 3-ER-286.

- **Tweet 1 by @cogitopp on September 10, 2021**:  "To begin with, the top of a certain company H has slept with so many employees back when he was at Frea○Out.  And apparently, he hasn't changed even at the certain company H.  I don't mind him playing around but it's inappropriate as a CEO to continue hitting on employees…"  3-ER-186; 3-ER-286.[2]

- **Tweet 2 by @cogitopp on September 10, 2021**: "I heard from employees at both a certain company F and a certain company H.  He was particularly aggressive when he was at the certain company F, and I think every employee knows."  3-ER-187; 3-ER-287.[3]

About two weeks later, John Doe 2 tweeted again, this time asking why Bain

Capital, a U.S.-based investment firm, would "invest on hey":

- **Tweet 3 by @mlnk901 on September 26, 2021**: "My impression of Ba○n Capital is that they are a group of super-talented people and post excellent results, but I don't understand why they would invest on hey while being aware of the risks.  I know my acquaintances must be very intelligent and

---

[1] This brief uses the English translations of these posts provided by Hey in support of its Section 1782 application.  3-ER-311-316; *see also* 3-ER-186-187.

[2] Tweet 1 is a retweet of Tweet 1A.  3-ER-239 (¶ 13); 3-ER-277-278.  The text appears as "Frea○Out" in the original Tweet.  John Doe 1 has stated that the Tweet intentionally left out the letter "k" to obscure its reference to "FreakOut."  2-ER-161 (¶ 12).

[3] Tweet 2 is a reply to Tweet 1.  3-ER-239-240 (¶ 13).

have enough common sense to judge between wight [sic] and wrong, but apparently there seem to be someone not like that." 3-ER-187; 3-ER-287.[4]

Over a month later, @DJ_AsadaAkira made a reference to current Hey CEO Yusuke Sato and former CEO Yusuke Mitsumoto committing or supporting unethical conduct:

- **Tweet 4 by @DJ_AsadaAkira on October 27, 2021**: "To Mr. Kentaro Kewabe, Z Holdings (@dennotai), I believe entrepreneurship embracing unethical and law-evading spirits such as Yusuke Mitsumoto and supporters like Anri Samata and Yusuke Sato in the entrepreneurial community should be criticized first to purge out from the community before making political statements. What do you think?" 3-ER-187; 3-ER-287.

## C. Proceedings Below

On February 1, 2022, Hey submitted an *ex parte* application under 28 U.S.C. § 1782 for leave to issue a subpoena to X Corp. for documents that would disclose identifying information about the users of the accounts that posted these Tweets. 3-ER-285-295. Hey argued that the Tweets defamed and unlawfully interfered with the company in the following ways: First, Tweets 1A and 2 purportedly linked "Company H" to a "tequila incident," which Hey understood to refer to a "notable event" in Japan when former Hey CEO Mitsumoto "played a 'tequila game' with a female in Tokyo, whose condition suddenly changed thereafter, and she was rushed to the hospital where she died." 3-ER-286. Second, Tweet 1

---

[4] The text appears as "Ba◯n Capital" in the original Tweet. John Doe 2 has stated that the Tweet was referencing Bain Capital. 2-ER-165 (¶ 5).

mentioned "Frea○Out," a supposed reference to FreakOut Holdings, Inc., a company founded by current Hey CEO Sato. 3-ER-286. Third, Tweet 3 mentioned Hey and purportedly suggested that investing in the company was unwise. 3-ER-287. Finally, Tweet 4 referred to Mitsumoto and Sato and stated that "entrepreneurship embracing unethical and law-evading spirits … should be criticized." 3-ER-287. Hey argued that the Tweets were actionable under Japanese law because they purportedly "contain[ed] false factual statements" that harmed Hey's reputation, 3-ER-299-300, "diminish[ed] the objective social evaluation of [Hey's] morality, reputation and trustworthiness," 3-ER-300, and "were tweeted for harassment purposes," *id.* Hey sought to unmask the accountholders on the grounds that it "intends to bring a lawsuit in Japan." 3-ER-288.

The district court granted Hey's *ex parte* application. 3-ER-282. The court found that the statute authorized it to issue the subpoena and then briefly analyzed the four discretionary factors that the Supreme Court set out for Section 1782 applications in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004). 3-ER-280-282. Those four factors require a district court to consider [1] whether "the person from whom discovery is sought is a participant in the foreign proceeding," [2] "the nature of the foreign tribunal" and its "receptivity … to U.S. federal court judicial assistance," [3] whether the discovery sought "conceals an

- 8 -

attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States," and [4] whether the request is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 264-265. The court did not consider whether unmasking the accountholders would violate the First Amendment.

Before granting Hey's application, the court did not hear from X Corp. or the accountholders, but it held that both should be provided a mechanism to "contest the disclosure of [the accountholders'] personal identifying information pursuant to the subpoena." 3-ER-282. The court thus directed X Corp. to serve the subpoenas and the court's order on the accountholders, and provided X Corp. and the accountholders 30 days from the date of service to contest the subpoena. *Id.*

Hey served the subpoena on April 22, 2022. 3-ER-215-219. Hey sought from X Corp. "all names, addresses … email addresses … and telephone numbers" for the accountholders; the names and addresses of credit card holders registered to those accounts; and the "dates, times, IP addresses, and access type" used by the three accounts to make the Tweets in question. 3-ER-219. X Corp. notified the accountholders of the subpoena. *See* Dist. ECF 9 at 1.

X Corp. moved to quash the subpoena, arguing that the third and fourth *Intel* factors militated against issuance of a subpoena seeking to unmask the anonymous speakers. 3-ER-183-207. X Corp. principally argued that the fourth *Intel* factor

supported quashing the subpoena as unduly intrusive and burdensome because Hey could not satisfy the test for unmasking anonymous speakers set out in *Highfields Capital Management, L.P. v. Doe*, 385 F. Supp. 2d 969 (N.D. Cal. 2005). That test balances a plaintiff's interest in pursuing viable claims against the First Amendment harms that result from unmasking anonymous speakers. It requires the plaintiff to demonstrate that it has a "real evidentiary basis" for viable claims and to show that the unmasking is necessary to enable the plaintiff to pursue those claims. 3-ER-188-196. Hey never disputed that it was required to meet the *Highfields* standard. Instead, Hey agreed that the fourth *Intel* factor turned on whether "the *Highfields* test is satisfied," *see* 2-ER-66, and argued that it satisfied *Highfields* because it established that the Tweets constituted defamation and business interference under Japanese law, 2-ER-61-66, and that Hey's "need for discovery outweighs the anonymous [X] users' interest in anonymous internet speech," 2-ER-66; *see* Does Br. 13-14. X Corp. also argued that the third *Intel* factor supported quashing the subpoena because the subpoena would circumvent United States policies by punishing speech protected by the First Amendment. 3-ER-196-206. In response, Hey argued only that "an anonymous speaker may be unmasked when his statement is found to be defamation under Japanese law." 2-ER-67-68 (citing *In re Yasuda*, 2020 759404, at *6 (N.D. Cal. Feb. 14, 2020)).

- 10 -

Counsel appeared on behalf of two of the accountholders, John Doe 1 and John Doe 2. The Does joined in the motion to quash. 2-ER-154-158. The third accountholder, @DJ_AsadaAkira, never appeared in the proceedings. 1-ER-7.

The district court denied the motion to quash. Although the court had previously required a Section 1782 applicant to satisfy the *Highfields* test before unmasking an anonymous speaker, 1-ER-7, the court here declined to do so because "recent opinions" from judges in the Northern District of California had rejected application of that test "where the record does not indicate that anonymous speakers are U.S. citizens and thus possess First Amendment rights." 1-ER-6-7. The court then found it sufficient that Hey had "'described the legal and factual bases for its contemplated foreign legal proceeding' and explained how the discovery it seeks … 'will aid prosecution of that proceeding.'" 1-ER-13 (alterations omitted). And the court found that enforcing the subpoena would not violate U.S. policy because the speakers to be unmasked did not "possess First Amendment protections." 1-ER-14.

The Does appealed the order denying the motion to quash. 3-ER-332. This Court set a briefing schedule under which the Does, as Movant-Appellants, would file an opening brief and both Plaintiff-Appellee Hey and Defendant-Appellee X Corp. would file answering briefs on the same date. Dkt. 1. After the Does timely filed their brief, Dkts. 8, 11, X Corp. obtained a streamlined 30-day extension to

file its answering brief, moving the deadline for both X Corp.'s and Hey's briefs to November 20, 2023. Dkt. 22. Less than a week later, counsel for X Corp. informed counsel for Hey and the Does that they expected Hey might wish to respond to arguments raised by X Corp. in its brief and that X Corp. would not oppose a request by Hey to extend the briefing schedule so that Hey could file its brief some period of time after X Corp. Holtzblatt Decl. ¶ 2. Counsel for the Does responded that they also would not oppose such a request. *Id.* ¶ 3. Counsel for Hey never responded. ¶ 4. Instead, Hey filed its answering brief over a month before the deadline. Dkt. 24.[5]

## STANDARD OF REVIEW

This Court reviews the district court's decision under 28 U.S.C. § 1782 for abuse of discretion. *Four Pillars Enters. v. Avery Dennison Corp.*, 308 F.3d 1075, 1078 (9th Cir. 2002). "A district court abuses its discretion when it applies the incorrect legal standard or if its application of the correct legal standard was illogical, implausible, or without support from the facts in the record." *United States v. Williams*, 68 F.4th 564, 571 (9th Cir. 2023). "Reversal is warranted when 'the district court misperceives the law or does not consider relevant factors and thereby misapplies the law.'" *Id.*

---

[5] X Corp. was not required to file its own notice of appeal. "[A]n appellee need not cross-appeal to argue in support of the appellant." 15A Wright & Miller, Federal Practice & Procedure § 3904 (3d ed. Apr. 2022 update).

## SUMMARY OF THE ARGUMENT

The district court abused its discretion when it declined to quash the subpoena because it misapplied the law under Section 1782.

I.     The district court erred in declining to require Hey to satisfy the *Highfields* test.  Because a core component of the freedom protected by the First Amendment is the right to speak anonymously, a district court must apply the *Highfields* test before issuing or enforcing a subpoena under Section 1782 that would unmask an anonymous speaker.

The district court mistakenly dismissed the First Amendment interests at stake in this case.  The court's decision reflects a worrying trend of district courts casting aside the vital protections of *Highfields* when reviewing a subpoena seeking to unmask anonymous speakers who are noncitizens or whose citizenship is unclear.  Such a subpoena burdens the rights of American citizens to hear the speech, the rights of U.S.-based platforms such as X to disseminate anonymous speech, and the rights to speak anonymously of noncitizens who possess First Amendment protections based on their connections to the United States.

The *Highfields* test protects these First Amendment rights by requiring that a plaintiff seeking a subpoena to unmask an anonymous speaker make an evidentiary showing of a viable claim and demonstrate that disclosure of the speaker's identity is necessary to pursue that claim.  The *Highfields* test aligns with similar tests

- 13 -

applied by jurisdictions across the country to protect anonymous speech. And it implements, in the context of subpoenas, the "exacting scrutiny" standard that the Supreme Court applies to burdens on anonymous speech. Applying a less demanding standard than the *Highfields* test to a subpoena that seeks to unmask an anonymous online speaker would unjustifiably chill valuable speech.

II.    The Does would have prevailed if the district court had applied *Highfields*, as it was required to do. Hey failed to make the requisite evidentiary showing to support its Japanese law claims, and failed to establish that the balance of harms weighed in its favor. The Court should therefore reverse and order the district court to quash the subpoena.

## ARGUMENT

### I.    THE DISTRICT COURT ABUSED ITS DISCRETION BY NOT APPLYING *HIGHFIELDS*

As the Does explain, the district court abused its discretion by refusing to apply the *Highfields* test before sustaining a subpoena seeking to unmask anonymous online speakers. Does Br. 7. An "author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm.*, 514 U.S. 334, 342 (1995). Anonymous speech is part of "an honorable tradition of advocacy and of dissent." *Id.* at 357. Indeed, historical evidence suggests that its protection was embodied in

the original meaning of the First Amendment. *Id.* at 371 (Thomas, J., concurring). And as this Court has emphasized, anonymous speech online "stands on the same footing"—and so is entitled to the same First Amendment protections—"as other [anonymous] speech." *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011) (citing *Reno v. ACLU*, 521 U.S. 844, 870 (1997)). The constitutional protections afforded to anonymous speech therefore require that in all cases—including those brought under Section 1782—courts asked to authorize a subpoena that would unmask an anonymous speaker "appropriately consider[] the important value of anonymous speech balanced against a party's need for relevant discovery in a civil action." *Id.* at 1176.

Courts in this Circuit ordinarily safeguard the right to speak anonymously by applying the test outlined in *Highfields Capital Management, L.P. v. Doe*, 385 F. Supp. 2d 969 (N.D. Cal. 2005). And "most if not all cases in the Northern District of California" have historically "applied the *Highfields* test where anonymous speech was implicated in the 1782 context." Does Br. 15. *See also, e.g.*, *In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 876 (N.D. Cal. 2022); *Wirt v. Twitter, Inc.*, 2021 WL 5919846, at *1-3 (N.D. Cal. Dec. 15, 2021); *Tokyo Univ. of Social Welfare v. Twitter, Inc.*, 2021 WL 4124216, at *4 (N.D. Cal. Sept. 9, 2021); *In re PGS Home Co. Ltd.*, 2019 WL 6311407, at *6 (N.D. Cal. Nov. 25, 2019); *Music Grp. Macao Commercial Offshore Ltd. v. Does*, 82 F. Supp.

3d 979, 983 (N.D. Cal. 2015); *Fodor v. Doe*, 2011 WL 1629572, at *3 (D. Nev. Apr. 27, 2011).

The *Highfields* test requires a party seeking to unmask an anonymous speaker to present a "real evidentiary basis" for believing that the plaintiff has suffered a real harm to interests that the law protects. *Highfields*, 385 F. Supp. 2d at 975-976. If the plaintiff does so, the court then must determine that "enforcing the subpoena would cause relatively little harm to the defendant's First Amendment and privacy rights and that its issuance is necessary to enable [the] plaintiff to protect against or remedy serious wrongs." *Id.* at 976.

The Does correctly contend the district court abused its discretion when it declined to apply *Highfields* here. Does Br. 7. The district court was required to apply *Highfields* under Section 1782 because the subpoena threatens the First Amendment interests of U.S. citizen listeners, U.S.-based platforms, and noncitizens with substantial connections to the United States. Because it did not apply *Highfields*, the district court did not properly balance Hey's interest in unmasking against the First Amendment interests at stake—as required by Supreme Court precedent applying exacting scrutiny to burdens on anonymous speech—and undermined important public interests in anonymous speech.

- 16 -

**A. The *Highfields* Test Must Be Applied Under *Intel* Because A Section 1782 Discovery Order Is Not "Appropriate" If It Would Burden First Amendment Rights Without Adequate Justification**

Section 1782 "authorizes, but does not require, a federal district court to provide judicial assistance to foreign or international tribunals or to 'interested person[s]' in proceedings abroad." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004). If a court concludes that it has statutory authority to grant a discovery application under Section 1782, the court must then determine "whether a discovery order *should* be granted in a particular case," *id.* at 264 (emphasis added), or if the request should instead be "rejected or trimmed," *id.* at 265. In *Intel*, the Supreme Court identified four factors that "bear consideration in ruling on a [Section 1782] request." *Id.* at 264. These factors are "guides for the exercise of district-court discretion," *id.* at 263 n.15, but "whether a discovery order should be granted in a particular case" might depend on additional considerations that the Supreme Court determined were best to "leave … to the courts below," *id.* at 264, 266. *See also id.* at 264 (rejecting "categorical limitations on [Section 1782's] scope").

*Intel* requires district courts considering a Section 1782 application to assure themselves that discovery assistance "is appropriate." 542 U.S. at 247. Under this standard, district courts should not authorize discovery that would burden First Amendment rights, including when a subpoena seeks to unmask an anonymous

- 17 -

speaker without adequate justification. When the discovery assistance sought

would compel the disclosure of an anonymous speaker's identity, the plaintiff

seeking such assistance must therefore satisfy the *Highfields* test.

The *Intel* factors themselves make clear that authorizing discovery would be

inappropriate where First Amendment rights are burdened unjustifiably. The

fourth *Intel* factor indicates that courts should deny—in whole or part—requests

that are "unduly intrusive or burdensome." 542 U.S. at 265. A "request for

identifying information" that undermines First Amendment protections therefore

"is unduly burdensome under *Intel*." *In re PGS*, 2019 WL 6311407, at *6. And

the third *Intel* factor asks whether a Section 1782 request "conceals an attempt to

circumvent foreign proof-gathering restrictions or other policies of a foreign

country or the United States." 542 U.S. at 265. Granting a discovery order that

burdens anonymous speech would circumvent "[t]he policy of the First

Amendment," which "favors dissemination of information and opinion." *Bigelow

v. Virginia*, 421 U.S. 809, 829 (1975). As one court recently observed in the

Section 1782 context, "the principles underlying the First Amendment may counsel

a court of the United States against exercising its discretion to aid in punishing

speech that would be protected in this country." *See In re Plan. & Dev. of Educ.,

Inc.*, 2022 WL 228307, at *4 n.3 (N.D. Cal. Jan. 26, 2022).

Moreover, courts are not limited to the four factors discussed in *Intel* when considering whether to permit discovery under Section 1782. Courts "should also take into account any other pertinent issues arising from the facts of the particular dispute." *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 245 (2d Cir. 2018); *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 WL 183944, at \*4 (N.D. Cal. Jan. 17, 2013) (in Section 1782 case, "the Special Master did not err in considering additional factors he thought appropriate" beyond the *Intel* factors). For example, in one of the cases relied upon by the district court here, the court deemed it "appropriate" under Section 1782 not to limit itself to the *Intel* factors, but to consider "the merits of [the] foreign claim" as well. *See Zuru, Inc. v. Glassdoor, Inc.*, 614 F. Supp. 3d 697, 703 (N.D. Cal. 2022).

The factors discussed in *Intel*, and *Intel*'s basic command that discovery assistance must be "appropriate" to the particular case, require that courts in Section 1782 cases apply the *Highfields* test to subpoenas seeking to unmask anonymous users. *Highfields* recognizes that a speaker's interests in remaining anonymous are rooted in the First Amendment "right to express most effectively and anonymously, without fear of expensive adverse consequences … views about matters in which many other members of the public are interested." 385 F. Supp. 2d at 974-975. And it weighs these considerations against a plaintiff's interests in protecting its rights under federal and state law. *See id.* at 975. For example, in

*Highfields*, the court balanced two conflicting interests: on the one hand, the First Amendment interests of an anonymous speaker who had used the name "highfieldscapital" to post online messages that appeared to contain insider information about a company in which Highfields—a multibillion dollar hedge fund manager—was the largest shareholder, *id.* at 973; and on the other hand, Highfields' interest in "preventing competitive commercial exploitation of its property (name) and in protecting itself from unfair commercial abuse," *id.* at 975.

By "strik[ing] an appropriate balance between competing interests and public policies," 385 F. Supp. 2d at 974, the *Highfields* test ensures that discovery assistance is appropriate and not unduly burdensome or in contravention of U.S. policies under *Intel*. Like all courts evaluating subpoenas that would unmask anonymous speakers, courts in Section 1782 cases must therefore "consider the potential chilling effect of ordering disclosure of the anonymous defendant's identity." *In re Yasuda*, 2020 WL 759404, at *6 (N.D. Cal. Feb. 14, 2020). And they must do so by applying the *Highfields* test.

### B. The *Highfields* Test Must Be Applied Even If The Anonymous Speakers To Be Unmasked May Be Noncitizens Outside The United States

The district court determined that it need not apply *Highfields* because it believed that the First Amendment categorically is not implicated when a subpoena seeks to unmask the anonymous speech of a noncitizen outside of the United

States. 1-ER-6-8, 1-ER-13-14. But as the Does explain, the court "abused its discretion in not analyzing the Section 1782 application under the *Highfields* test," Does Br. 7. X Corp. and the Does had argued to the district court that "Hey's Section 1782 application should be analyzed under the *Highfields* test" and "Hey never argued in its opposition … that the *Highfields* test was inapplicable." *Id.* at 13. Yet, contrary to the agreement of both the parties and "most if not all cases" that had been decided at the time of the motion to quash, *id.* at 15, the court *sua sponte* held that *Highfields* did not apply. Its decision is part of a recent, worrying trend of district courts that have "declined to apply the *Highfields* test in the Section 1782 context" when confronted with a subpoena seeking to unmask anonymous speech by noncitizens abroad. *Id.*; *see, e.g.*, *Zuru*, 614 F. Supp. 3d at 706; *In re Takada*, 2023 WL 1442844, at *3 (N.D. Cal. Feb. 1, 2023); *Takagi v. Twitter*, 2023 WL 1442893, at *3-4 (N.D. Cal. Feb. 1, 2023).

The district court's *sua sponte* decision to discard the vital protections of *Highfields* was especially flawed because even *Zuru*, which declined to apply *Highfields*, recognized that *Intel* may require review of the merits of the plaintiff's claim before a Section 1782 application is granted. 614 F. Supp. 3d at 703. As the *Zuru* court observed, "[t]here are competing interests at play" when a subpoena seeks to unmask anonymous speakers, even if the citizenship of those speakers is not clear from the record. *Id.* While a platform "wants to safeguard anonymous

speech on its website," a plaintiff may "want[] to protect its reputation." *Id.* "Both interests can't simultaneously be accommodated," and "[i]n deciding which interest should prevail, the merits matter." *Id.* The *Zuru* court accordingly took "[a] peek at the merits" to "ensure that [the plaintiff] ha[d] legitimate reasons for outing the anonymous [speakers]." *Id. Zuru* thus upheld an unmasking subpoena only after determining that the plaintiff had "done enough to show that its defamation claim [was] plausible," *id.* at 708, including by putting forward "evidence" that "could be used to prove" the elements of its claim, *id.* at 706.

In any event, like the district court's decision below, the recent "series of district court decisions [that] have declined to apply the *Highfields* test," Does Br. 15, gives short shrift to the First Amendment rights at stake, and Hey does not even attempt to defend their reasoning, Hey Br. 3-4. When noncitizens abroad are penalized for speaking anonymously on U.S. platforms, the rights of American citizens to hear that speech, the rights of platforms to disseminate it, and even the rights of noncitizens—who may themselves enjoy a substantial connection to the United States—to speak in the first place, all are threatened.

### 1. Unmasking Anonymous Speech By Noncitizens Abroad Burdens The Right Of American Citizens To Hear That Speech

The subpoena in this case implicates the First Amendment right of U.S. citizens to "receive information and ideas." *See Kleindienst v. Mandel*, 408 U.S.

753, 762-763 (1972). The Supreme Court has recognized the First Amendment burdens imposed by state action that restricts the free flow of information from abroad, including information and ideas expressed by foreign speakers. *See id.* at 764-765; *Lamont v. Postmaster General of U.S.*, 381 U.S. 301, 306-307 (1965). This Court too has held that "the First Amendment right to receive information includes the right to receive information from outside the United States." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 743-744 (9th Cir. 2021). The court abused its discretion by failing to consider these potential First Amendment burdens when it declined to apply the *Highfields* test.

Decisions of the Supreme Court and this Court firmly establish that curtailing speech by noncitizens abroad implicates the First Amendment rights of U.S.-based listeners. In *Lamont*, the Supreme Court held that the First Amendment barred the postal service from holding back "communist political propaganda" sent from abroad and imposing an affirmative obligation on addressees within the United States to request in writing that the mail be delivered. 381 U.S. at 302, 306-307. The *Lamont* Court emphasized that federal agencies could not "regulate the flow of mail" so as to "control the flow of ideas to the public." *Id.* at 306. Key to the Court's holding was that the regulation would likely cause addressees "to feel some inhibition" in sending for the literature, which underscored that the

- 23 -

regulation was "at war with the 'uninhibited, robust, and wide-open' debate and discussion that are contemplated by the First Amendment." *Id.* at 307.

In *Mandel*, the Supreme Court held that the First Amendment was implicated by the Attorney General's denial of a visa to a Belgian citizen who was living in Belgium and sought entry to the United States to speak at a conference at Stanford. *See* 408 U.S. at 756-757. Like in *Lamont*, the Court noted "the purpose of the First Amendment to preserve an uninhibited marketplace of ideas," and "the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences[.]" *Id.* at 763. Notably, the *Mandel* court approved of the district court's explanation that the issue at hand was not "a non-resident alien's individual and personal interest in … being heard," but "the rights of the citizens of the country … to hear him explain and seek to defend his view." *Id.* at 764.

And in *Thunder Studios*, this Court held that the First Amendment protected the speech and speech-related conduct of noncitizens that took place in the United Arab Emirates and Australia. 13 F.4th at 740-744. The Court emphasized that "domestic listeners" have the right to "receive speech from foreign speakers." *Id.* at 744. It then held that the foreign speakers themselves (and not just the domestic listeners) were "protected under the First Amendment" because their speech was "directed at and received by California residents." *Id.* *Thunder Studios* therefore

- 24 -

articulated two relevant principles:  First, domestic listeners also have a First Amendment right to receive foreign speech.  Second, even "a noncitizen living abroad has standing to claim the protections of the First Amendment" under certain circumstances, such as when their speech is "directed at and received by" U.S. residents.  *Id.*[6]

These cases reaffirm that the district court abused its discretion by overlooking the First Amendment rights that would be burdened by enforcing Hey's subpoena.  The Tweets expose potential misconduct by high-level corporate executives and discuss the risks associated with a major American private equity firm's affiliation with Hey.  *See* 3-ER-186-187.  Restrictions on the flow of this information and these ideas from abroad burden the First Amendment rights of U.S. citizens.  Penalizing this speech may, for example, cut off valuable information to U.S.-based investors.  In Tweet 3, John Doe 2's anonymous statements about Hey were made in "respon[se] to a press release announcing that Bain Capital had invested in [H]ey."  1-ER-10.  The Tweet questioned why Bain

---

[6] Judge Lee's dissent bolsters that reading of *Thunder Studios*.  He wrote separately to argue that the majority had erred because foreign speakers themselves could not "seek refuge in … the First Amendment" where those speakers "lack[ed] substantial voluntary connection to this country."  *Id.* at 748 (Lee, J., dissenting).  And while Judge Lee recognized that an American audience had a "right to receive information from abroad," he argued that foreign speakers who never "had *any* connection to the United States" could not assert that right as a shield against the application of California law.  *Id.* at 752-753.

Capital would make such an investment "while being aware of the risks," *id.*, underscoring that anonymous speakers abroad share valuable insights that American companies may turn to when making business decisions inside the United States. Compelled disclosure of anonymous online identities also may silence voices from abroad that fuel political movements or academic studies within the United States. The subject matter of Tweets 1A, 1, and 2—purported sexual misconduct—exemplifies the kind of information that activists, scholars, and journalists in America may hunt for online. Noncitizens in foreign countries speaking anonymously—and thus without fear of reprisal—can offer crucial perspectives that shape the actions of these U.S-based listeners.

There is no principled basis for diminishing this right to receive speech from abroad merely because it takes the form of anonymous online speech. *See In re Anonymous Online Speakers*, 661 F.3d at 1173. The accountholders' statements in this case are equally critical to ensuring "the 'uninhibited, robust, and wide-open' debate and discussion that are contemplated by the First Amendment." *See Lamont*, 381 U.S. at 307. The protection of *Highfields* therefore is necessary for a subpoena, like the one Hey seeks, that would unmask anonymous speakers, even if those speakers may be noncitizens abroad. And while the right of "domestic listeners" to hear the accountholders' speech does not hinge on whether their speech was "directed at" U.S.-based listeners, *cf. Thunder Studios*, 13 F.4th at 744,

- 26 -

that the accountholders spoke on X, a U.S.-based platform, further underscores the First Amendment interests at stake, because it cannot be assumed that the speech was directed only at other noncitizens abroad.  *See also infra* Section I.B.3.

> **2.      Unmasking Anonymous Users Who Are Noncitizens Living Abroad Burdens The Right Of Platforms To Make First Amendment-Protected Editorial Decisions**

Unmasking the accountholders in this case also burdens X Corp.'s right to curate the content on its platform.  "First Amendment protection extends to corporations" like X Corp. that are based in the United States.  *Citizens United v. FEC*, 558 U.S. 310, 342 (2010); *see also Twitter, Inc. v. Garland*, 61 F.4th 686, 711 (9th Cir. 2023) (discussing "Twitter's First Amendment rights").  And the exercise of "editorial control and judgment" by such corporations is protected by the First Amendment.  *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).  As the Supreme Court has explained, "[t]he choice of material to go into a newspaper … and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment" protected by the First Amendment.  *Id.*

This right to choose whether and how to host other people's messages is not "restricted to the [traditional] press."  *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 574 (1995).  The Supreme Court has accordingly held that a private utility cannot be forced to include third-party

speech in its billing envelopes, *Pacific Gas & Elec. Co. v. Public Utils. Comm'n of Cal.*, 475 U.S. 1, 20-21 (1986) (plurality op.); that cable companies' exercise of editorial discretion over stations and programs is entitled to First Amendment protection, *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994); and that a private parade organizer cannot be forced to include a group whose message it disapproves, *Hurley*, 515 U.S. at 574-576. In so holding, the Court observed that "the presentation of an edited compilation of speech generated by other persons … fall[s] squarely within the core of First Amendment security" and that the "selection of contingents" to make up that compilation "is entitled to similar protection." *Id.* at 570.

These principles apply directly to X Corp.'s editorial policies concerning how to disseminate content or to host certain speakers or speech. Numerous courts have recognized that social media platforms "exercise editorial judgment that is inherently expressive" and thus "engage in First-Amendment-protected activity" when they determine what content to allow on their websites. *See NetChoice, LLC v. Attorney General*, 34 F.4th 1196, 1213 (11th Cir. 2022), *cert. granted sub nom. Moody v. NetChoice, LLC*, 2023 WL 6319654 (U.S. Sept. 29, 2023); *see also, e.g.*, *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186 (N.D. Cal. 2022), *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023); *Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 443 (S.D.N.Y. 2014). "[D]ecisions about what speech to

- 28 -

permit, disseminate, prohibit, and deprioritize—decisions based on platforms' own particular values and views—fit comfortably within the Supreme Court's editorial-judgment precedents." *NetChoice*, 34 F.4th at 1214.[7]

X Corp.'s decision to allow the accountholders and others to post content anonymously on its platform is a paradigmatic editorial decision protected by the First Amendment. Only some platforms permit and encourage users to post content anonymously. For example, while X "allows the use of pseudonymous accounts,"[8] LinkedIn "does not allow members to use pseudonyms, fake names, business names, associations, groups, email addresses, or special characters that do not reflect [the member's] real or preferred professional name."[9] A platform like X that chooses to cultivate anonymous content is making a "judgment about whether and to what extent it will publish information to its users—a judgment rooted in the platform's own views about the sorts of content and viewpoints that are valuable and appropriate for dissemination on its site." *NetChoice*, 34 F.4th at

---

[7] This Court has declined to reach that question, *see O'Handley*, 62 F.4th at 1156 n.1, and the Supreme Court is set to weigh in on the issue this term, *see Moody*, 2023 WL 6319654, at *1 (granting certiorari on First Amendment question).

[8] *See Misleading And Deceptive Identities Policy*, X Help Center (Apr. 2023), https://help.twitter.com/en/rules-and-policies/x-impersonation-and-deceptive-identities-policy.

[9] *Names Allowed On Profiles*, LinkedIn Help, https://www.linkedin.com/help/linkedin/answer/a1337288 (last visited Nov. 20, 2023).

1210. And as discussed below, there are compelling reasons why a platform would choose to create an environment where anonymous content can thrive. *See infra* Section I.E.

The district court improperly discounted these important rights—and thus abused its discretion, Does Br. 7—when it declined to apply the *Highfields* test, and instead concluded that it was sufficient for Hey to "describe[] the legal and factual bases for its contemplated foreign legal proceeding' and explain[] how the discovery it seeks … 'will aid prosecution of that proceeding.'" 1-ER-13. That standard, which would too easily allow the issuance of subpoenas that unmask anonymous users who are noncitizens abroad, would burden platforms' rights to make the curatorial choice to disseminate anonymous speech.

A user who knows that a platform may be compelled in the future to identify them without rigorous procedural safeguards will be less likely to speak anonymously in the present. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 195-196 (2010). A standard for unmasking anonymous speakers under which platforms cannot reasonably assure their users of anonymity therefore creates an "intrusion into the function of editors." *See Tornillo*, 418 U.S. at 258. A standard that functionally eliminates platforms' ability to disseminate anonymous speech also contravenes the "fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message," including

"those choices of content that in someone's eyes are misguided, or even hurtful."

*Hurley*, 515 U.S. at 573-574.

**3.    Unmasking Anonymous Speech Hosted By U.S.-Based Platforms May Burden The First Amendment Rights Of The Speakers, Even If They Are Noncitizens Abroad**

Finally, the subpoena in this case risks burdening the First Amendment

rights of noncitizens with substantial connections to the United States.  Although

some noncitizens lack First Amendment rights, the Supreme Court has emphasized

that noncitizens may enjoy constitutional protections by virtue of "significant

voluntary connection with the United States."  *See United States v. Verdugo-*

*Urquidez*, 494 U.S. 259, 271 (1990).

This Court has thus found that noncitizens with substantial voluntary

connections to the United States can assert constitutional claims.  In *Ibrahim v.*

*Department of Homeland Security*, this Court held that a noncitizen abroad, who

alleged that she was mistakenly placed on the no-fly-list and thus barred from

entering the United States, could assert a First Amendment claim.  669 F.3d 983,

986 (9th Cir. 2012).  The noncitizen had "established 'significant voluntary

connection' with the United States" under *Verdugo-Urquidez*, and her claim arose

from facts that "further[ed]" rather than "sever[ed]" "her connection to the United

States."  *Id.* at 997.  And in *Wang v. Reno*, the Court held that a noncitizen could

bring a Fifth Amendment due-process claim under the principles articulated in

*Verdugo-Urquidez* because he did not experience "an isolated, extraterritorial violation of the Constitution," but rather a violation of his rights "on American soil" and "in an American courtroom." 81 F.3d 808, 817 (9th Cir. 1996). Both *Ibrahim* and *Wang* were distinguishable from the facts of *Verdugo-Urquidez*, where the noncitizen lacked such a substantial voluntary connection because "he was a citizen and resident of Mexico with no voluntary attachment to the United States," and his claim arose from an allegedly unconstitutional search that took place "in Mexico." 494 U.S. at 274-275.

Moreover, this Court has indicated that, where First Amendment speech rights are at issue and speech is directed at U.S. listeners, the "significant voluntary connection" standard of *Verdugo-Urquidez*, 494 U.S. at 271, may be insufficiently protective. *See Thunder Studios*, 13 F.4th at 744. As *Thunder Studios* noted, "[s]peech was not at issue" in *Verdugo-Urquidez* and "the only action at issue occurred outside the United States." *Id.* The Court also distinguished *Ibrahim* because that case "involved freedom of association rather than speech." *Id.* The Court moreover considered whether the Supreme Court's decision in *Agency for International Development v. Alliance of Open Society International, Inc.*, 140 S. Ct. 2082 (2020), had restricted the rights of noncitizen speakers abroad who direct their speech at the United States—and concluded that it had not, *see Thunder Studios*, 13 F.4th at 744. As Judge Lee recognized in dissent, *Thunder Studios* thus

- 32 -

extends the First Amendment's protection even to noncitizens who "conduct no business in America" and have likely never "set foot on American soil." *Id.* at 749, 752 (Lee, J., dissenting) (disagreeing with the Court's conclusion but recognizing its breadth).

This Court's precedents therefore refute the district court's assumption that noncitizens abroad have no First Amendment rights. A noncitizen abroad who speaks anonymously on a U.S.-based platform may enjoy First Amendment rights for a number of reasons. She "further[s] … her connection to the United States" by speaking on a U.S.-based platform and in doing so may establish a "significant voluntary connection" with the United States. *Cf. Ibrahim*, 669 F.3d at 997. She may be directing her speech toward American listeners by choosing a U.S.-based platform rather than a foreign alternative. And she may have a substantial voluntary connection to the United States by virtue of facts not apparent from the record. Any standard for unmasking anonymous speakers must account for and protect these First Amendment interests.

**C.    The Near-Uniform Practice Of Jurisdictions Across The Country Supports Application Of The *Highfields* Test**

The principles articulated in *Highfields* ensure that courts adequately balance a subpoena's chilling effect on First Amendment-protected anonymous speech against a party's need for discovery. Even as the details of their inquiries differ at the margins, jurisdictions across the country have adopted a framework that

- 33 -

parallels *Highfields* by requiring a party seeking to unmask anonymous speech to demonstrate (often with evidence) that it has a viable claim, and that unmasking the speaker is necessary to support that claim. The practice of courts across the country thus favors the application of *Highfields* to subpoenas that seek to unmask anonymous speakers.

The tests adopted by these courts share two core features: plaintiffs must show that (1) the claim for which they are seeking to unmask the speaker is viable and (2) unmasking the speaker is necessary to their pursuit of that claim.

*First*, these tests all require plaintiffs to make some showing that they have a viable claim. Like in *Highfields*, the required showing typically is evidentiary—plaintiffs must do more than satisfy a mere pleading standard. 385 F. Supp. 2d at 975-976. The landmark decision in *Dendrite International, Inc. v. Doe No. 3* explained, for instance, that a plaintiff must make out "a prima facie case" by "produc[ing] sufficient evidence supporting each element of its cause of action" before a court could unmask the speaker's identity. 775 A.2d 756, 760 (N.J. App. Div. 2001).

Other jurisdictions have likewise required that plaintiffs establish a prima facie case. *See, e.g.*, *Doe v. Coleman*, 497 S.W.3d 740, 746-747 (Ky. 2016); *Thomson v. Doe*, 356 P.3d 727, 734-735 (Wash. App. 2015); *In re Ind. Newspapers Inc.*, 963 N.E.2d 534, 552 (Ind. App. 2012); *Pilchesky v. Gatelli*, 12

A.3d 430, 443-444 (Pa. Super. 2011); *Independent Newspapers, Inc. v. Brodie*, 966 A.2d 432, 456 (Md. 2009); *Krinsky v. Doe 6*, 159 Cal. App. 4th 1154, 1172 (2008). Still other jurisdictions set the bar even higher, requiring plaintiffs to introduce "evidence creating a genuine issue of material fact for all elements of [their] claim within the plaintiff's control." *Doe v. Cahill*, 884 A.2d 451, 460, 463 (Del. 2005); *see also, e.g., Solers, Inc. v. Doe*, 977 A.2d 941, 954 (D.C. 2009) (similar); *Mobilisa, Inc. v. Doe*, 170 P.3d 712, 720 (Ariz. App. 2007) (similar).

At the very least, district courts have required a plaintiff seeking to unmask an anonymous speaker to establish that it "could withstand a motion to dismiss," *see Columbia Ins. Co. v. seescandy.com*, 185 F.R.D. 573, 579 (N.D. Cal. 1999), or that it has a "legitimate, good faith basis to contend that it may be the victim of conduct actionable in the jurisdiction where the suit was filed," *In re Subpoena Duces Tecum to America Online, Inc.*, 52 Va. Cir. 26 (2000), *rev'd on other grounds*, *America Online, Inc. v. Anonymous Publicly Traded Co.*, 261 Va. 350 (2001). As a California appeals court observed, "[e]ven the decisions imposing a motion-to-dismiss obligation nonetheless require 'some showing' that the tort took place." *Krinsky*, 159 Cal. App. 4th at 1171.

*Second*, courts across the country consistently mirror *Highfields* by requiring that the plaintiff seeking to unmask an anonymous speaker show that the unmasking is necessary to allow the plaintiff to pursue its claim. *See* 385 F. Supp.

2d at 976. In some jurisdictions, courts are even expressly required to consider the availability of alternative discovery methods. Once again, *Dendrite* is instructive. *Dendrite* emphasized that the standard a court uses to evaluate a subpoena seeking to unmask an anonymous speaker must "balance the defendant's First Amendment right of anonymous free speech against the strength of the prima facie case presented *and the necessity for the disclosure of the anonymous defendant's identity* to allow the plaintiff to properly proceed." 775 A.2d at 760-761 (emphasis added).

Other courts have followed suit, articulating a requirement that plaintiffs demonstrate that disclosure of the anonymous speaker's identity is critical to the success of a viable claim. *See, e.g.*, *In re Ind. Newspapers*, 963 N.E.2d at 552; *Pilchesky*, 12 A.3d at 444-445; *Brodie*, 966 A.2d at 457; *Krinsky*, 159 Cal. App. 4th at 1172; *Mobilisa*, 170 P.3d at 720. In California, for instance, a court will refuse to quash a subpoena only if the plaintiff makes a prima facie showing of the elements of its claim *and* "it is clear to the court that discovery of the defendant's identity is necessary to pursue the plaintiff's claim." *Krinsky*, 159 Cal. App. 4th at 1172. And in Arizona, an evidentiary showing alone is not sufficient because a plaintiff's "ability to survive summary judgment would not account for" cases in which the plaintiff "may have only a slight need for the anonymous party's identity." *Mobilisa*, 170 P.3d at 720.

In some jurisdictions, courts evaluate the necessity of disclosure by considering "the availability of alternative discovery methods." *See Mobilisa*, 170 P.3d at 720; *accord In re Ind. Newspapers*, 963 N.E.2d at 552 ("Factors that the trial court should consider in balancing the parties' rights include … 'the availability of other discovery methods.'"). Unless "the requested information … is unavailable by other means" and "is fundamentally necessary to secure relief," the balance of interests does not favor unmasking the anonymous speaker. *See Pilchesky*, 12 A.3d at 444-445. While not all jurisdictions "require a showing that the plaintiff has *exhausted* alternative sources for learning the information" sought, *see Solers, Inc.*, 977 A.2d at 954-956 (emphasis added), the jurisdictions that forgo this requirement typically impose a demanding summary judgment evidentiary standard. Their logic is that the summary judgment standard itself "balance[s] the defendant's First Amendment rights against the strength of the plaintiff's *prima facie* case." *Cahill*, 884 A.2d at 461. Even so, some of these jurisdictions still require that a court "ensure that the information sought is important to the litigation." *Solers, Inc.*, 977 A.2d at 955.

### D. Supreme Court Jurisprudence Applying "Exacting Scrutiny" To Burdens On Anonymous Speech Likewise Supports Application Of The *Highfields* Test

The Supreme Court applies an "exacting scrutiny" standard to burdens on the right to speak anonymously, including to compelled disclosure requirements

that target individual anonymous speakers and thus regulate "pure speech." *See McIntyre,* 514 U.S. at 345-346; *Reed*, 561 U.S. at 196. This same exacting scrutiny standard applies to disclosure requirements that unmask a speaker only *after* she has spoken. *See Reed*, 561 U.S. at 195-196. The Supreme Court likewise applies exacting scrutiny to "compelled disclosure of affiliation with groups engaged in advocacy," recognizing that such compelled disclosure burdens the right to speak anonymously as well as the related right to associate. *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) ("*AFP*") (internal quotations omitted). Under the exacting scrutiny standard, there must be a "substantial relation between the disclosure requirement and a sufficiently important governmental interest" and "the disclosure requirement [must] be narrowly tailored to the interest it promotes." *Id.* at 2385.

In the specific context of subpoenas that seek to unmask anonymous speakers, the *Highfields* test implements the exacting scrutiny that generally applies to burdens on anonymous speech. Just as exacting scrutiny requires some "substantially relevant correlation between the governmental interest asserted and the State's effort to compel disclosure," *AFP*, 141 S. Ct. at 2384, *Highfields* requires a "real evidentiary basis" for the claims it seeks to assert, 385 F. Supp. 2d at 975-976. And like exacting scrutiny's narrow tailoring requirement, which takes into account the extent to which a burden on First Amendment rights is

- 38 -

"unnecessary," *AFP*, 141 S. Ct. at 2385, the "real evidentiary basis" requirement of *Highfields* ensures that the court does not "invade … rights that are fundamental and fragile" in an "unjustified" manner, 385 F. Supp. 2d at 975. Finally, *Highfields* requires the court "to assess and compare the magnitude of the harms that would be caused to the competing interests" of the anonymous speaker and the plaintiff. *Id.* at 976. This echoes the exacting scrutiny standard's evaluation of whether a chill on First Amendment activity—even an indirect one—is substantially related to an important government interest. *AFP*, 141 S. Ct. at 2384.

The *Highfields* test therefore establishes the minimum standard that courts must apply when reviewing subpoenas that seek to unmask anonymous speakers, regardless of the nature of the anonymous speech. This Court has observed that "the nature of the speech should be a driving force in choosing a standard by which to balance the rights of anonymous speakers in discovery disputes." *In re Anonymous Online Speakers*, 661 F.3d at 1177. Accordingly, a more demanding standard than *Highfields* may be appropriate in some cases, such as when a plaintiff seeks to unmask "expressly political" anonymous speech. *See id.* But even when an anonymous speaker engages in purely commercial speech—a narrow category not applicable here—the protections of *Highfields* apply. *See,*

*e.g.*, *Tokyo Univ.*, 2021 WL 4124216, at *4.[10] No matter what variety of speech is at issue, *Highfields* serves as an essential "means of ensuring that plaintiffs do not use discovery procedures to … harass, intimidate or silence critics." *Dendrite*, 775 A.2d at 771. Any lower standard could "needlessly strip defendants of anonymity in situations where there is no substantial evidence of wrongdoing, effectively giving little or no First Amendment protection to that anonymity." *Solers*, 977 A.2d at 952.

### E.    Vital Public Interests Served By Anonymous Speech Support Application Of The *Highfields* Test

Finally, the *Highfields* test serves the public interest by appropriately safeguarding the right to speak anonymously on the Internet. Like the Supreme Court, this Court has recognized that "the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely without 'fear of economic or official retaliation … [or] concern about social ostracism.'" *In re Anonymous Online Speakers*, 661 F.3d at 1173 (quoting *McIntyre*, 514 U.S. at 341-342) (alterations in original).

---

[10] Commercial speech is a narrow category of speech that "does no more than propose a commercial transaction." *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011). As *Highfields* illustrates, even when speech is made in a business context, "the challenged conduct and the harm suffered" will not always be "'commercial' in nature." 385 F. Supp. 2d at 976.

The right to speak anonymously continues to shape and improve modern life. The Internet in particular has allowed anonymous speech to flourish by providing outlets for, and means of, communication that never existed before. This anonymity enables valuable communications that would not otherwise occur, such as tips through anonymous reporting mechanisms[11]; whistleblower reports of suspected fraud, abuse, or criminal activity[12]; and confidential sources who reveal information of great public importance to journalists.[13] Anonymous speech allows individuals to share personal information they would not otherwise disclose, enabling them to seek help for addiction or mental-health issues,[14] or to seek spiritual and religious guidance.[15] And anonymous speech nourishes a vibrant

---

[11] *See* Libit, *Elements of an Effective Whistleblower Hotline*, Harvard Law School Forum on Corporate Governance (Oct. 25, 2014), https://corpgov.law. harvard.edu/2014/10/25/elements-of-an-effective-whistleblower-hotline.

[12] *See* U.S. Gov't Accountability Office, *Report and Prevent Fraud*, https://www.gao.gov/about/what-gao-does/fraud (last visited Nov. 20, 2023).

[13] *See* Reporters' Comm. for Freedom of Press, *Reporter's Privilege Compendium*, https://www.rcfp.org/reporters-privilege (last visited Nov. 20, 2023).

[14] *See* Alcoholics Anonymous, Understanding Anonymity 5-6 (June 2023), https://www.aa.org/sites/default/files/literature/p-47_understandinganonymity.pdf; Substance Abuse and Mental Health Services Administration, *National Helpline: Frequently Asked Questions*, https://www.samhsa.gov/find-help/national-helpline (last visited Nov. 20, 2023) ("The service is confidential. We will not ask you for any personal information.").

[15] *See* Araujo, *International Tribunals and Rules of Evidence: The Case for Respecting and Preserving the "Priest-Penitent" Privilege under International Law*, 15 Am. U. Int'l L. Rev. 639, 645 (2000).

artistic and literary landscape,[16] enabling creators to provoke without fear of backlash, or reach a wider audience without fear of bias. *See McIntyre*, 514 U.S. at 341 & n.4. That is to say nothing of the critical role anonymity continues to play in the political arena. *Id.* at 342-343 ("[E]ven in the field of political rhetoric … the most effective advocates have sometimes opted for anonymity.").

The freedom to speak anonymously online is a key component of this right. As the Supreme Court has observed, "[w]hile in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general, and social media in particular." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Internet users may disclose sensitive personal information and political or ideological viewpoints, or even engage directly with their elected representatives to "make [their] voice heard." *See id.* at 107. Data reveals that a clear majority of Internet users surveyed view anonymity on the Internet as vital, and that many have taken advantage of opportunities to remain anonymous online.[17] Anonymity on the Internet can, after

---

[16] *See Why Do Some Writers Use Pseudonyms?*, The Economist (July 25, 2013).

[17] Rainie et al., *Anonymity, Privacy, and Security Online*, at Part 1, Pew Research Center (Sept. 5, 2013), https://www.pewresearch.org/internet/2013/09/05/anonymity-privacy-and-security-online.

all, create space for activism and keep victims of violence and harassment safe

from retribution by concealing their activities or location.  It can also allow those

looking to discuss sensitive personal topics—from fertility challenges to grief,

abuse, and depression—to find a community.  Where users cannot count on

anonymity, these vital outlets are compromised.

## II.    THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING THE MOTION TO QUASH THE SUBPOENA BECAUSE HEY DID NOT SATISFY *HIGHFIELDS*

The district court abused its discretion when it overlooked the critical First

Amendment rights at stake in this case and denied the motion to quash the

subpoena.  As Does explain, "because [they] presented unopposed facts that would

defeat [Hey's] lawsuit in Japan," Hey did not meet the *Highfields* test.  Does Br. 7.

The district court therefore erred in not quashing the subpoena.

Under *Highfields*, Hey was required to present a prima facie case, or "real

evidentiary basis," for believing that the accountholders engaged in wrongful

conduct causing real harm to Hey's interests.  385 F. Supp. 2d at 975-976.  Hey did

not establish a prima facie claim of defamation under Japanese law, and thus did

not satisfy the *Highfields* test.  To hold a defendant liable for tortious conduct

under the Japanese Civil Code, a plaintiff must establish that the defendant has

unlawfully infringed rights or interests of the plaintiff protected by law and thereby

caused the plaintiff to suffer damages.  *See* 3-ER-237 (¶¶ 6-7).  A statement does

not constitute defamation if it is "not specific enough for an ordinary reader to

identify that the statement concerns the plaintiff." 3-ER-238 (¶ 8.a). Nor is a statement defamatory if it does not "harm[] the victim's social reputation." 3-ER-238 (¶ 8.b). And even if a statement harms the plaintiff's social reputation, the defendant will not be liable if the statement is on a matter of public interest, was made for the benefit of the public, and there are sufficient reasons to believe the facts underlying the statement are true. 3-ER-239 (¶ 9). Hey did not make an evidentiary showing that it can prove defamation under these elements.

*First*, Hey did not establish that Tweets 1A, 1, and 2 constituted unlawful defamation because those Tweets contain statements that are insufficiently specific to defame Hey. Japanese courts consider whether the statement is "specific enough for an ordinary reader to identify that they are about the victim." 3-ER-238 (¶ 8.a). Tweets 1A, 1, and 2 do not meet this standard. As relevant here, Tweets 1A and 1 refer to a "tequila incident" that "happened sometime after" one of the speakers advised a friend about "some shady stuff" at "a certain company H," and to the conduct of "the top of a certain company H" who previously "was at Frea○Out." 3-ER-186. Tweet 2, responding to Tweets 1A and 1, refers only to "a certain company F" and "a certain company H." 3-ER-187.

While Hey understands these Tweets to reference Hey, its former CEO Mitsumoto, and its current CEO Sato, an ordinary reader would not. The Tweets do not name Hey, Mitsumoto, or Sato. The Tweets do not explain what the

"tequila incident" was or link it to Hey or Mitsumoto; indeed, the event that Hey

assumes the "tequila incident" is referencing took place months after Mitsumoto

left Hey.  3-ER-240 (¶ 14.b).  And an ordinary reader would understand, at most,

that the Tweets reference an executive of an unnamed "company H" who once

worked at a company "Frea○Out" (whose name the speaker intentionally obscured,

2-ER-161 (¶ 12)).  To interpret the Tweets as referencing Hey, a reader would have

to know that Sato was previously affiliated with a company called "FreakOut," that

he had since become an executive at a "company H," and that the company in

question was Hey—a tall order given the hundreds of individuals affiliated with

companies (plural) named "FreakOut," 3-ER-241 (¶ 15).

*Second*, to the extent the Tweets were specific enough for an objective

reader to understand them as referencing Hey, none was defamatory because none

harmed Hey's social reputation.  Under Japanese law, "abstract, non-particularized

and unspecific statements directed against the plaintiff are not defamatory"

because they cannot damage the plaintiff's social reputation.  3-ER-238 (¶ 8.b).

Moreover, when "unethical behavior … only relates to the individual's private

life," it "does not damage a company's social reputation."  3-ER-242 (¶ 18).  And

"whether a statement of opinion or criticism, without factual statements, harms

one's reputation … should be strictly judged."  3-ER-238 (¶ 8.c).

- 45 -

These principles foreclose a defamation claim based on the statements at issue here.  As noted, none of the Tweets names Hey, the purported victim of defamation.  *See supra* pp.44-45.  Instead, Tweets 1 and 2 opine on the behavior of individuals, and do so with "unspecific" statements that are incapable of harming Hey's reputation as a matter of law.  Tweet 1 states obliquely that "the top of a certain company H" slept with employees at a previous company and "apparently … continue[s] hitting on employees" at "company H," which the author opined was "inappropriate."  3-ER-186.  Tweet 2 claims only that the author had heard the unnamed individual "was particularly aggressive when he was at the certain company F."  3-ER-187.  Viewed objectively, these statements at most criticize unethical behavior by Hey employees, not by Hey itself, and thus cannot harm Hey's social reputation under Japanese law.  3-ER-242 (¶ 18).

Tweets 1A and 3 refer abstractly to what the author perceives as the "risk" presented by investment in Hey.  Tweet 1A mentions "shady stuff" that caused another person to form a "personal[] feeling" that involvement with "a certain company H" was "risky."  3-ER-186.  Tweet 3 expresses confusion as to why the "super-talented people" at "Ba○n Capital" would "invest on hey while being aware of the risks."  3-ER-187.  Investment is always a risk.  Calling attention to that risk—especially in the form of an amateur opinion that offers no concrete

- 46 -

supporting facts—cannot damage Hey's social reputation under the "strict[]
judg[ment]" of Japanese courts.  3-ER-238 (¶ 8.c).

Tweet 4, while critical of specific individuals currently or previously
affiliated with Hey, is far too abstract to harm Hey's social reputation.  Tweet 4
opines that "entrepreneurship embracing unethical and law-evading spirits," like
that of Mitsumoto and Sato, "should be criticized."  3-ER-187.  As noted, the
opinion that Mitsumoto and Sato are "unethical and law-evading," *id.*, reflects only
on them as individuals, not on Hey.  Even if an ordinary reader came to the
conclusion that Tweet 4 was calling for Hey to be criticized for employing those
individuals, that unspecific disapproval of the company can hardly damage its
social reputation.

*Third*, Hey did not establish that it suffered any damages caused by the
accountholders' statements.  3-ER-237 (¶¶ 6-7); 3-ER-239 (¶ 10).  Hey's Japanese
legal expert claimed that the Tweets harm Hey by "diminishing [its] social
reputation and infring[ing] its honor."  2-ER-74 (¶ 15).  As explained below, they
did not.  But in any case, these conclusory assertions do not provide evidentiary
support for Hey's claim that the Tweets caused the company harm.

Nor can such support be found in the declaration of Hey CEO Sato.  Sato
laments that the accountholders' statements have "spread across [X]."  2-ER-151
(¶ 2).  But Sato offers no context for what this "spread" entails or how it damaged

Sato. A court cannot determine, based on Sato's claim, that the Tweets "would sully [Hey's] reputation in any quarter that might matter to it." *Highfields*, 385 F. Supp. 2d at 981. Sato further states that the anonymous author of Tweet 4 has been "trolling" Hey employees on X, which has "obstructed" the employees' "activities through [X]." 2-ER-151-152 (¶¶ 3-4). But Sato does not explain how X use by Hey's employees contributes to Hey's business or how this purported "obstruct[ion]" has detracted from it. 2-ER-152 (¶ 4). And Sato claims that the same anonymous user has "tagged [Hey's] [X] account with malicious replies to sponsorship posts by sponsors of a large event for engineers," which Sato "assume[s]" is an effort to damage Hey. 3-ER-152 (¶ 4). Sato nowhere explains how these "sponsors of a large event" relate to Hey, or how the Tweets tagging these sponsors (which Hey does not seek to unmask) even damaged Hey.

*Finally*, even if the Tweets had harmed Hey, Hey did not establish that the accountholders are liable for that harm by putting forth evidence that the statements were false or that they were not made for the benefit of the public. 3-ER-239 (¶ 9); 3-ER-243 (¶¶ 23-24). As the Does' legal expert explained, "under Japanese law, even if the Tweets are defamatory, if the facts presented by the Tweets are true or there are proper reasons to believe they are true, the Tweets are not unlawful." 3-ER-169 (¶ 9). And as one court applying a *Highfields*-like standard observed, "[a] plaintiff does not make a prima facie claim of defamation

- 48 -

if the contested statement is essentially true." *Cf. Dendrite*, 775 A.2d at 772; *see also Tokyo Univ.*, 2021 WL 4124216, at *5 (quashing subpoena where "it is not clear that the statements in the tweet are false"). Here, the record includes a declaration from John Doe 1 explaining that the statements at issue were based on personal knowledge. *See* 2-ER-160-162. Hey did not dispute this evidence, and thus cannot establish that the Does would be liable for defamation.

Hey also failed to establish a prima facie case of unlawful business interference. A plaintiff alleging unlawful business interference must "establish that its business has incurred loss as a result of the statements, such as loss of customers and other actual harm to the business." 3-ER-239 (¶ 10). As explained above with respect to defamation, Hey did not make this required showing. *See supra* pp.47-48.

While Hey's failure to establish a prima facie case is dispositive under *Highfields*, the *Highfields* test also cannot be satisfied because the balance of harms underscores that unmasking the anonymous speakers is not necessary to enable Hey to protect against or remedy serious wrongs.

The harm of unmasking the accountholders is well-established in the caselaw and clear from the record. Unmasking the accountholders would chill their speech, as both Does averred in their declarations: "I wish to stay anonymous so that I can continue to express my opinion on matters freely. If my identity is

revealed, I will be prevented from freely expressing my opinion in the future." 2-ER-162 (¶ 14); 2-ER-165 (¶ 6). This chilling effect is precisely what courts balancing the interests of the speaker and the plaintiff strive to prevent. As the *Highfields* court put it, "[a]nonymity liberates." 385 F. Supp. 2d at 980. "[E]nforcing a subpoena in this kind of setting poses a real threat to chill protected comment on matters of interest to the public." *Id.*; *see In re DMCA*, 608 F. Supp. 3d at 876 ("discovery would likely have a chilling effect"). Unmasking the accountholders would have greater consequences still—the refusal to honor their anonymity threatens to purge valuable expression from the Internet, *see supra* Section I.E, and burdens the First Amendment rights of X Corp. and its users, *see supra* Section I.B.

By contrast, as explained above, the purported harm to Hey from the accountholders' statements is purely speculative. Hey points to paltry evidence that its own reputation, or that of its current or former CEO, has been harmed by the Tweets. *See supra* pp.47-48. At bottom, Hey offers "no reason to believe that there is any risk that these messages will draw clients to [its] competitors or will cause potential clients to pause before engaging [its] services." *Highfields*, 385 F. Supp. at 981. The balance of harms therefore favors the accountholders.

## CONCLUSION

This Court should reverse the district court and quash the subpoena.

Respectfully submitted,

/s/ Ari Holtzblatt

JONATHAN HAWK
MCDERMOTT WILL & EMERY
2049 Century Park East
Suite 3200
Los Angeles, CA 90067
(310) 788-4181

ARI HOLTZBLATT
JEREMY W. BRINSTER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
ari.holtzblatt@wilmerhale.com

EMILY BARNET
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

November 20, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 11,914 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


/s/  Ari Holtzblatt
ARI HOLTZBLATT

November 20, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of November, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Ari Holtzblatt
ARI HOLTZBLATT